UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DANIEL T. WARREN,

        Plaintiff,

        v.

MARINER FINANCE, LLC,

        Defendant.

16-CV-221
DECISION & ORDER

---

On February 27, 2016, the plaintiff, Daniel T. Warren, filed a complaint in New York State Supreme Court, Erie County, alleging that a loan issued by the defendant, Mariner Finance, LLC ("Mariner"),[1] was usurious and therefore void. Docket Item 1-2. Warren also alleged violations of the Fair Credit Reporting Act ("FCRA") and New York General Business Law ("GBL") § 349. Docket Item 1-2. On March 15, 2016, Mariner removed Warren's complaint to this Court under 28 U.S.C. § 1331. Docket Item 1.[2] On April 4, 2016, Warren amended his complaint. Docket Item 11.

On April 22, 2016, Mariner moved to dismiss for failure to state a claim. Docket Item 19. On May 25, 2016, Warren responded, Docket Item 25, and on June 14, 2016, Mariner replied, Docket Item 27. On June 20, 2016, Warren moved for partial summary

---

[1] Warren also alleged claims against two other defendants—credit reporting agencies TransUnion LLC, and Equifax Information Services, LLC—but this Court subsequently dismissed the claims against those defendants by stipulation of the parties. Docket Items 24, 26, 32, and 33.

[2] This case originally was assigned to the Honorable John T. Curtin and subsequently was transferred to the undersigned. See Docket Item 12.

judgment.  Docket Item 28.  On August 9, 2016, Mariner responded, Docket Item 30, and on August 16, 2016, Warren replied, Docket Item 31.

For the reasons that follow, this Court grants in part and denies in part Mariner's motion to dismiss.  More specifically, the Court grants Mariner's motion with respect to Warren's usury claim but will allow Warren to amend his complaint with respect to his claims under the FCRA and GBL § 349 **within 45 days of the days of this decision and order.**  The Court denies Warren's motion for partial summary judgment as moot.[3]

## BACKGROUND

A liberal reading of the complaint tells the following story.  On July 10, 2014, Warren received a check in the mail in the amount of $2,539.00 from Mariner, a licensed lender under New York Banking Law ("BNK") Article IX.  Docket Item 11 (amended complaint) ¶¶ 11-12.  The "check was unaccompanied by any other documents." *Id.* ¶ 12.  The correspondence on the back of the check informed Warren "that in order to accept the unsecured loan . . . primarily for personal, family, or household purposes from . . . Mariner[,] all [Warren] had to do was cash the check." *Id.*  The terms of the loan required repayment at an annual interest rate of 24.99%. *Id.* ¶ 14.  These terms were printed in a font smaller than eight point. *Id.* ¶ 52.  Warren cashed the check and therefore accepted the loan. *Id.* ¶ 12.

---

[3] Two days ago, Warren moved to amend his complaint to remove his FCRA claim and to remand this matter to state court.  Docket Item 34.  In light of this decision and order, Warren shall inform the Court **within 45 days of the date of this decision and order** whether he would like to proceed with his motion to remand or withdraw it.

In October 2014, Warren repaid $1,000.00. *Id.* ¶ 13. But Mariner "failed to apply the amount in excess of the monthly payment to the princip[al] of the loan." *Id.*

On February 1, 2016, Warren "noticed that this purported unsecured debt was appearing on [his] credit report as maintained by . . . Equifax and TransUnion." *Id.* ¶ 18. Warren "promptly disputed this item with . . . Equifax and TransUnion on the grounds that [he] was/is not liable for it." *Id.* The next day, Warren faxed a letter to Mariner, disputing his liability for the debt, stating that he considered the debt to be "legally void," and advising that he would not make any further repayments. *Id.* ¶ 19.

On February 23 and 27, 2016, Warren received the results of Equifax's and TransUnion's investigations, respectively. *Id.* ¶¶ 20-21. Both credit agencies stated that they had verified that the debt belonged to Warren. *See id.* ¶¶ 20-21 and Exhibit D. Moreover, "on a nearly daily basis since February 2, 2016[,] Mariner, by and through its agents, servants[,] and employees, [has] called [Warren]'s residence and/or place of business." *Id.* ¶ 22.

## DISCUSSION

**I.     MARINER'S MOTION TO DISMISS**

To survive a motion to dismiss, a complaint must include sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

3

more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557).

### A.     Usury Under New York General Obligations Law § 5-511

Warren alleges that Mariner's loan of $2,539.00 at an annual interest rate of 24.99% is unenforceable under New York General Obligations Law ("GOL") § 5-511 because the interest rate exceeds 16%.  Docket Item 11 ¶¶ 23-25.  Mariner counters that as "a lender licensed under [BNK] § 340 . . . [,] it may extend small loans with interest up to 25%."  Docket Item 19-1 at 2.  This Court agrees with Mariner.

GOL § 5-501 states:

> The rate of interest, as computed pursuant to this title, upon the loan or forbearance of any money, goods, or things in action, except as provided in subdivisions five and six of this section or as otherwise provided by law, shall be six per centum per annum unless a different rate is prescribed in section [14-a] of the banking law.

GOL § 5-501(1).  According to BNK § 14-a, "[t]he maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum." BNK § 14-a(1).  But BNK § 351(1) provides that "[e]very licensee hereunder may loan any sum of money not exceeding the maximum principal amounts prescribed in section [340] of this article, and may charge, contract for, and receive thereon *interest at the rate or rates agreed to by the licensee and the borrower.*"  *Id.* § 351(1) (emphasis added).  Section 340, in relevant part, states:

> No person or other entity shall engage in the business of making loans in the principal amount of [$25,000] or less for any loan to an individual for personal, family, household, or investment purposes . . . and charge, contract for, or receive a greater rate of interest than the lender would be permitted by law to charge if he were not a licensee hereunder *except*

4

>     *as authorized by this article* and without first obtaining a license from the superintendent.

BNK § 340 (emphasis added).

The New York State Department of Financial Services has issued several interpretations of BNK Article IX explaining that licensed lenders are authorized to extend loans of $25,000 or less with interest rates up to 25%—that is, the limit set by New York's criminal usury statute, New York Penal Law § 190.40.  *See, e.g.*, Banking Interpretations, N.Y. DEP'T OF FIN. SERVS. (Mar. 14, 2011), https://www.dfs.ny.gov/legal/interpret/lo110314.htm ("[T]he legal rate of interest in New York, as set forth in Section 14-a of the Banking Law, is 16% per annum. Consequently, the general rule is that[ ] unlicensed nonbank lenders may not charge more than that rate on the small loans within the purview of Article IX.  If such lenders obtain an Article IX license, they may charge interest up to 25% per annum on the small loans.  Any greater charge would be deemed to be criminal usury under the New York Penal Law."); Banking Interpretations, N.Y. DEP'T OF FIN. SERVS. (May 5, 2010), https://www.dfs.ny.gov/legal/interpret/lo100505.htm ("As previously stated, you do not need a license if you are charging not more than 16 percent, which is the maximum legal rate of interest.  You need a license if you are going over 16 percent."); Banking Interpretations, N.Y. DEP'T OF FIN. SERVS. (Nov. 6, 2007), https://www.dfs.ny.gov/legal/interpret/lo071106.htm (explaining that "all banking institutions licensed or chartered under the New York Banking Law are authorized to charge up to 25% on personal loans and therefore are not in violation of Section 340 when they charge more than 16% per annum on small loans"); Banking Interpretations, N.Y. DEP'T OF FIN. SERVS. (Jan. 14, 2005),

https://www.dfs.ny.gov/legal/interpret/lo050114.htm ("[BNK] §340, read together with Section 501 of the [GOL] and 3 NYCRR §4.1, provides that a license is required to engage in the making of loans to individuals in New York State having a principal amount of twenty five thousand dollars ($25,000) or less for personal, family, household or investment purposes . . . , having an annual rate of interest over 16%.").

Several courts have found that licensed lenders may exceed the 16% maximum on loans of $25,000 or less. *See, e.g., Beneficial N.Y., Inc. v. Stewart*, 25 Misc.3d 797, 799-801 (Sup. Ct. Kings Cty. 2009) (holding that a $5,000 loan extended by a licensed lender at an agreed-upon annual interest rate of 25% was not usurious); *In re Watkins*, 240 B.R. 668, 672 (Bankr. E.D.N.Y. 1999) ("Since each of the loans made by [the licensed lender] to [the plaintiffs was] in the principal amount of less than $25,000, [the lender] was permitted by statute to charge an interest rate of 25%.").

As the court observed in *Stewart*, this interpretation appears at first glance "to be somewhat inconsistent with the presumed purpose of [A]rticle IX, which is to 'protect from exorbitant and unconscionable demands the poor and needy who are compelled to borrow small sums to meet a pressing necessity.'"  25 Misc.3d at 799 (quoting *Bond v. Dentzer*, 494 F.2d 302, 309 n.4 (2d Cir. 1974)).  But, the court reasoned, "the inducement of higher interest rates is the only way to ensure that properly supervised, legitimate lenders will be willing to advance small loans to those who may pose repayment risks to the lender."  *Id.*

The only authority Warren cites in support of his contrary position—*Dollar Dry Dock Sav. Bank of N.Y. v. Bellino*, 206 A.D.2d 499 (2d Dep't 1994)—is inapposite. There, the Appellate Division, Second Department, upheld the trial court's determination

6

that a second mortgage of $25,000 with an interest rate of 21.06% was usurious.  *See id.* at 500; *see also* Docket Item 30-4 at 36-37.  But the BNK provisions in effect when that loan was made—former §§ 351(e) and 354—prohibited interest rates above 16% for loans of more than $4,000, *see* Docket Item 30-4 at 39-40—as opposed to the $25,000 threshold today.  Thus, as Mariner observes, "the Appellate Division . . . never reached the issue of whether licensed lenders could extend *small loans* with interest rates in excess of the civil usury rate."  Docket Item 30 at 8 (emphasis added).

In sum, licensed lenders may extend loans of $25,000 or less at interest rates higher than 16%.  As a licensed lender, Mariner was permitted to loan $2,539.00 to Warren at an agreed-upon annual interest rate of 24.99% without violating GOL § 5-501.  Warren's usury claim is therefore dismissed.

### B.   Fair Credit Reporting Act

Warren next contends that Mariner is liable under the FCRA as a "furnisher[ ] of information to consumer reporting agencies."  *See* 15 U.S.C. § 1681s-2.  More specifically, Warren alleges that Mariner failed to conduct a reasonable investigation of his claim that his debt to Mariner was erroneously listed on his credit report.

The FCRA provides that "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a [furnisher of information] to a consumer reporting agency," a furnisher must:

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

7

>> (C) report the results of the investigation to the consumer reporting agency;
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
>
>> (i) modify that item of information;
>>
>> (ii) delete that item of information; or
>>
>> (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681-s2(b)(1).  A furnisher is obligated to modify or delete a loan from a credit report only "if an item of information disputed by a consumer is found to be inaccurate or incomplete."  *Id.* § 1681-s2(b)(1)(E).  Moreover, a furnisher is required to investigate only issues specifically raised by consumers and relayed to the furnisher by the credit reporting agency.  *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005); *Mann v. Experian Info. Sols.*, No. 02 C 7694, 2004 WL 432498, at *4 (N.D. Ill. Feb. 19, 2004).

Here, Warren alleges that Mariner received a complaint about the listing of its loan on his credit report and "failed to conduct a reasonable investigation into the accuracy of information."  Docket Item 11 ¶¶ 40-42.  But the only issue Warren alleges that he raised to the credit reporting agencies was that Mariner's loan should be removed from his credit report "on the grounds that [he] was/is not liable for it."  *Id.* ¶ 18.

8

And, according to the amended complaint, Warren "is not liable for it" only because of the allegedly usurious interest rate. In other words, based on the allegations in the amended complaint, Warren's second cause of action rises or falls with his first.

As explained above, however, the loan was not usurious. Thus, the complaint fails to plausibly allege that the information on Warren's credit report was "inaccurate or incomplete," 15 U.S.C. § 1681-s2(b)(1)(E), and Mariner therefore had no obligation to remove it.

Warren also argues that "Mariner inaccurately reported the loan as secured, when in fact it is not." Docket Item 25 at 11 (citing Docket Item 11 ¶¶ 12, 44). But as Mariner observes, "[t]here is no allegation that [Warren] disputed the secured status of his loan" with the credit reporting agencies, and "[f]urnishers cannot be held liable to consumers for furnishing incorrect information under 15 U.S.C. § 1681-s2(a) and are only responsible for investigating the specific disputes raised by consumers." Docket Item 19-1 at 8 (citing 15 U.S.C.§ 1681-s2(c); *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1059 (9th Cir. 2002)).

For all those reasons, Warren has not stated a viable claim under the FCRA. Because Warren is proceeding *pro se*, however, leave to amend should be freely granted. *Frazier v. Coughlin*, 850 F.2d 129, 130 (2d Cir. 1988). Therefore, Warren may amend his complaint to address these deficiencies **within 45 days of the date of this decision and order.** Warren's amended complaint should clearly allege what information he relayed to the credit reporting agency and what information Mariner received about the dispute.

### C.     General Business Law § 349

In his third cause of action, Warren alleges that "Mariner has engaged in, and will continue unless enjoined [to] engage in, deceptive business practices in violation of GBL § 349." Docket Item 11 ¶ 51. GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York State]." GBL § 349(a). To successfully assert a claim under GBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)). As explained below, the allegations in Warren's amended complaint satisfy the first two prongs but fail to satisfy the third prong. The Court, however, will allow Warren to amend his GBL § 349 claim to correct this deficiency.

#### 1.     Warren Has Pleaded that Mariner's Allegedly Deceptive Practice Was Consumer-Oriented.

The first inquiry is whether Mariner's purportedly deceptive practice was "consumer-oriented." A practice is "consumer-oriented" when it has "a broader impact on consumers at large"; "[p]rivate contract disputes, unique to the parties, . . . would not fall within the ambit of the statute." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (N.Y. 1995). In other words, the practice at issue must "potentially affect similarly situated consumers." *Id.* at 27. New York courts have identified three non-dispositive factors in determining whether a practice is consumer oriented: "1) the amount of money involved in the agreement; 2) the relative bargaining power and sophistication of the parties; and 3) the nature of the agreement."

10

*Interested Underwriters at Lloyd's of London Subscribing to Policy No. 991361018 v. Church Loans & Investments Tr.*, 432 F. Supp. 2d 330, 332 (S.D.N.Y. 2006) (citing *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d. 308, 320-21 (N.Y. 1995)); *see also Bartlett v. Nationwide Mut. Fire Ins. Co.*, No. 12-CV-435-A, 2013 WL 623497, at *4 (W.D.N.Y. Feb. 19, 2013).

Here, all three factors lead to the conclusion that Mariner's lending practice was consumer-oriented. First, courts have held a practice to be consumer-oriented in light of the "modest" nature of the transaction. *See, e.g., N.Y. Univ.*, 87 N.Y.2d at 321 (characterizing the transaction in *Oswego*, 85 N.Y.2d at 24—which involved $30,060.26—as "modest"). Conversely, courts have reached the opposite conclusion when the dispute involves a larger amount. *See, e.g., Interested Underwriters at Lloyd's of London*, 432 F. Supp. 2d at 333 (insurance policy premium of $11,000, with a potential payout of $750,000); *Pfizer, Inc. v. Stryker Corp.*, No. 02 CIV.8613 LAK, 2003 WL 21660339, *4 (S.D.N.Y. July 15, 2003) ($2 billion); *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774-75 (2d Dep't 1995) ($350,000 contract value with payments of over $1 million). The present case involves a loan of $2,539.00, Docket item 11 ¶ 12, which is the "modest" type of transaction that GBL § 349 intends to reach. Thus, the first factor suggests that Mariner's practice was consumer-oriented.

The relative sophistication of the parties also favors this conclusion. Courts have repeatedly dismissed GBL § 349 claims based on transactions between "relatively sophisticated entities with equal bargaining power." *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004); *see also Pfizer*, 2003 WL 21660339, at *4 (dismissing GBL § 349 claim partly because the

transaction was "between two large, sophisticated parties"); *N.Y. Univ.*, 87 N.Y.2d at 321 (dismissing GBL § 349 claim because "[t]he case before us involves complex insurance coverage and proof of loss in which each side was knowledgeable and received expert representation and advice"). But that is not the case here. The loan at issue was between a sophisticated lending business and an individual borrower; the bargaining power between Mariner and Warren was plainly disparate.

Finally, courts have found that standard agreements tend to show that a business practice is consumer-oriented. *See, e.g., Oswego*, 85 N.Y.2d at 26 (finding that "[d]efendant [b]ank dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing [plaintiffs] with standard documents presented to customers upon the opening of accounts"); *Makuch v. N.Y. Cent. Mut. Fire Ins. Co.*, 785 N.Y.S.2d 236, 238 (4th Dep't 2004) ("[T]he allegations that the forms making up plaintiffs' insurance policy are standard and regularly used by defendant are sufficient to support the allegation that defendant's actions are consumer-oriented"). By contrast, "contracts that are not 'standard-issue,' but are instead designed to provide services 'tailored to meet the [plaintiff's] wishes and requirements[,]' are not consumer-oriented for § 349 purposes." *Exxonmobil*, 328 F. Supp. 2d at 449 (citing *N.Y. Univ.*, 87 N.Y.2d at 321).

Here, the agreement was standard in every sense of that word: indeed, neither the principal amount nor the interest rate was tailored to meet Warren's needs. Moreover, Warren's amended complaint refers to several debt-collection lawsuits that Mariner filed, allegedly demonstrating that Mariner extended loans in the same principal amount at the same interest rate to at least two other consumers. *See* Docket Item 11,

Exhibits A and C.  And that suggests that Mariner's "misrepresentations [were] boilerplate and [had] the potential to be repeated in order to deceive numerous similarly situated [borrowers]."  *Exxonmobil*, 328 F. Supp. 2d at 449.  Therefore, the third factor also supports the conclusion that Mariner's practice was consumer-oriented.

For those reasons, this case is more than an isolated "[p]rivate contract dispute[] unique to the parties" and has "a broader impact on consumers at large."  *See Oswego*, 85 N.Y.2d at 25.  Accordingly, Warren has adequately pleaded that Mariner's lending practice was consumer-oriented.

### 2. Warren Has Pleaded that the Practice Was Materially Misleading.

New York courts have adopted an objective definition of misleading:  the deceptive practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Oswego*, 85 N.Y.2d at 26.  "[A] material claim is one that 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"  *Bildstein v. Mastercard Int'l. Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004) (quoting *Novartis Corp. v. F.T.C.*, 223 F.3d 783, 787 (D.C. Cir. 2000)).

For example, courts have held that disclosing information to consumers in impermissibly small print constitutes a materially misleading practice for purposes of GBL § 349.  *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017) (explaining that "courts consider factors such as the font size, placement, and emphasis" of a disclaimer when evaluating whether a plaintiff has stated a GBL § 349 claim); *Lonner v. Simon Prop. Grp, Inc.*, 57 A.D.3d 100, 110-11 (2d Dep't 2008) (holding that "the inadequate font size in which the dormancy fee provision was printed, and the

13

defendant's concomitant failure to conspicuously disclose that provision," constituted a deceptive business practice" for purposes of GBL § 349); *Sims v. First Consumers Nat'l Bank*, 303 A.D.2d 288, 289 (1st Dep't 2003) (reversing trial court's dismissal of the plaintiffs' GBL 349 claim where "[t]he gist of plaintiffs' deceptive practices claim is that the typeface and location of the fee disclosures, combined with high-pressure advertising, amounted to consumer conduct that was deceptive or misleading in a material way, causing plaintiffs damages for purposes of [GBL] § 349"); *cf. Kommer v. Bayer Consumer Health*, 252 F. Supp. 3d 304, 312 (S.D.N.Y. 2017), *aff'd sub nom. Kommer v. Bayer Consumer Health, a division of Bayer AG*, 710 F. App'x 43 (2d Cir. 2018) (considering the defendant's use of a "reasonably-sized font" to print disclaimer a factor in dismissing the plaintiff's GBL § 349 claim).

Here, Warren alleges that "Mariner's deceptive acts and practices include, but are not limited to, . . . providing loan documents in a font smaller than eight points in depth as required by CPLR 4544." Docket Item 11 ¶ 52. Mariner's alleged use of small print in the loan agreement can be deemed "materially misleading," as the consumer might not be aware of the high interest rate of the loan.

### 3. Warren Has Not Alleged Injury as a Result of the Deceptive Practice.

While GBL § 349 "does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm." *Oswego*, 85 N.Y.2d at 26. "Section 349(h), which was added to the original statute to give private parties a right of action, grants that right only to 'any person who has been injured' by deceptive business practices." *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 599

(1st Dep't 1998), *aff'd*, 94 N.Y.2d 43 (N.Y. 1999).  As such, a claim under GBL § 349 "requires proof of a causal connection between some injury to [the] plaintiffs and some misrepresentation made by [the] defendants."  *Id.* at 604.

Warren asserts that the "willful or negligent[,] deceptive[,] and misleading practices of [Mariner] has caused direct, foreseeable, and proximate damages to [him]."  Docket Item 11 ¶ 53.  But he does not specify what those damages were.

The only specific injuries that Warren alleges to have suffered are those connected to his FCRA claim.  *Id.* ¶ 47.  More specifically, Warren claims that

> [a]s a direct and proximate result of . . . Mariner's willful and/or negligent refusal to conduct reasonable investigations as mandated by the FCRA as outlined above, [he] has suffered loss and damage including but not limited to: economic loss due to loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of-pocket expenses, worry, fear, distress, frustration[,] and embarrassment.

*Id.*

Warren does not connect any of these injuries to Mariner's use of small print in the loan documents or Mariner's failure to adequately disclose relevant information in general.  *See Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 544 (S.D.N.Y. 2018) (concluding that the plaintiffs suffered no injury as a result of the defendant's deceptive practice because the plaintiffs failed to offer facts connecting their reputational harm and lost business to the defendant's misrepresentation on its website).  As Mariner observes, "[n]ot one of [Warren's] listed damages can be traced directly to text size, clarity of terms of loan documentation[,] or the alleged reporting of the loan as secured."  Docket Item 19-1 at 12.  Warren does not, for example, allege that he would not have

15

accepted the high-interest loan absent Mariner's deception.[4]  *See Bildstein*, 329 F. Supp. 2d at 414-15 (granting motion to dismiss because the plaintiff "failed to allege that the claimed deception caused him to pay more in making his foreign currency purchases than he otherwise would have paid"); *Sokoloff v. Town Sports Int'l Inc.*, 778 N.Y.S.2d 9, 10-11 (1st Dep't 2004) (upholding dismissal for failure to plead actual injury where the plaintiff sued her health club, because she did "not claim any kind of monetary loss other than payment of her membership fees").

As noted above, however, because Warren is proceeding *pro se*, leave to amend should be freely granted.  *Frazier*, 850 F.2d at 130.  Therefore, Warren may amend his GBL § 349 claim **within 45 days of the date of this decision and order.**  Warren's amended complaint should clearly allege the damage he has suffered as a result of Mariner's conduct and explain how Mariner's conduct caused such damage.

## II.   WARREN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Warren also moves for partial summary judgment on his claim that Mariner's loan was usurious.  Docket Item 28.  In light of this Court's finding that Warren's amended complaint fails to state a claim on that issue, Warren's motion for partial summary judgment is denied as moot.

---

[4] In his opposition to Mariner's motion to dismiss, Warren states that he "entered into an agreement that but for the deceptive practices of Defendant Mariner he would not have and therefore has suffered actual harm in that Defendant Mariner intends to collect the balance due."  Docket Item 25 at 14.  But as Mariner observes, "[a] complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."  Docket Item 27 at 6 (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 407 (W.D.N.Y. 2010)).

**CONCLUSION**

For the foregoing reasons, Mariner's motion to dismiss, Docket Item 19, is GRANTED IN PART AND DENIED IN PART. Warren's claim under GOL § 5-501 is DISMISSED. Warren may amend his complaint with respect to his claims under the FCRA and GBL § 349 **within 45 days of the date of this decision and order.** Warren also shall inform the Court **within 45 days of the date of this decision and order** whether he would like to proceed with his motion to remand, Docket Item 34, or withdraw it.

Warren is advised that an amended complaint is intended to ***completely replace*** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)*; see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint must include all allegations against the defendant so that the amended complaint stands alone as the only complaint that the defendant must answer in this action. If Warren does not amend his complaint within 45 days of the date of this decision and order, the complaint will be dismissed without further order of the Court. Warren's motion for partial summary judgment, Docket Item 28, is DENIED AS MOOT.

SO ORDERED.

Dated: August 12, 2020
    Buffalo, New York

                                */s/ Lawrence J. Vilardo*
                                LAWRENCE J. VILARDO
                                UNITED STATES DISTRICT JUDGE